[L. A. No. 4123.   Department Two.—December 31, 1917.]

PETER HAACK et al., Respondents, v. SAN FERNANDO MISSION LAND COMPANY (a Corporation) et al., Appellants.

BOUNDARY—DEED—WATERS AND WATERCOURSES—"WASH" OF STREAM AS BOUNDARY.—The term "wash" of a .stream, as used in the call in a deed, is a word in popular usage in the southern part of California, denoting the sandy, rocky, gravelly, boulder bestrewn part of the river bottom arising from deposits of torrential streams debouching from mountain channels and forming on the level lands rocky, gravelly, and sandy stretches of waste land or desert.

ID.—CONSTRUCTION OF DEED.—In an action to quiet title, where a call of a deed located a boundary line as "the center line . . . or wash" of a certain creek, "as the same existed" at a certain date, the court properly construed those words as calling for the center line of the creek channel where the creek had a defined channel, and for the center line of the wash if a well-defined channel did not exist.

APPEAL from a judgment of the Superior Court of Los Angeles County.   Frank G. Finlayson, Judge.

The facts are stated in the opinion of the court.

Tanner, O'Dell, O'Dell & Taft, for Appellants.

Avery & French, and R. M. Widney, for Respondents.

HENSHAW, J.—In an action to quiet title brought by plaintiffs against defendants, the real controversy was over the boundary line between their respective land holdings. Plaintiffs prevailed in their contention as to the location of this boundary line and defendants have appealed.   The call in the deed to plaintiffs' land which gives rise to this controversy is "the center line of said Pacoima Creek or wash as the same existed on the fourteenth day of June, 1882." It is conceded that plaintiffs own the land to the east of that line wherever it may be located.   The word "wash" employed in the description belongs neither to the terminology of geology nor of law.   It is, however, a word in popular usage in the southern part of the state and as used is quite capable of definition.   The streams in the southern part of the state rising in the mountains flow through narrow and often deep channels with sharp grades until they debouch on to the level lands below.   They are torrential in character, carrying great quantities of water during the heavy rains in winter and becoming partially or wholly dry during the rainless season.   At times, cloudbursts or long-continued heavy rains in the mountains cause these streams to overflow their banks in the valley lands below and flood the neighboring country.   In the torrential season these streams bring down from the mountains, and for centuries have brought down, boulders, smaller stones, gravel, and sand, and as the velocity of the waters so

moving and carrying these earthy matters is arrested upon entering the plains, they begin, under familiar laws, to deposit, first, the heavy boulders at and near the mouth of the canyon, or mountain passes, down which they have descended; next the smaller rocks, next the gravel, and finally the sands. Naturally, the greatest of these deposits is below and near to the canyon mouth, and they spread out fan-wise, lessening in depth and thickness until finally they feather out into nothingness. Geologically, the whole area of land thus affected, being built up of these deposits, is known as the "cone" of the stream. The "wash," though bearing relation to the cone, is not synonymous with it. As these conditions of increased winter flow occur every year, and as each year is brought down and deposited debris of the character described, it results in creating upon the lower reaches of the stream always at the point where the waters first flow on to the level land, and at times in other parts of the river bottom, rocky, gravelly, and sandy stretches of waste lands, desolate to the eye and nourishing little or no vegetation; in brief, a tiny desert. It is this sandy, rocky, gravelly, boulder bestrewn part of the river bottom which is known as the wash. The wash is not, of course, coterminous with the cone. It frequently happens that in the lapse of centuries the outer portions of the cone have accumulated sufficient humus to create a fertile and fruitful soil raised above the danger of ordinary flooding. Through the wash the waters of the stream find their way. Under the conditions outlined it is quite apparent that the channel of the stream will move about in this wash. An impediment at the head of the old channel may cause a diversion; an obstruction at the lower part of the old channel will cause its rapid filling with debris, and so in time force the stream to leave it and make for itself a new way. Frequently, then, the channel of the stream shifts in the wash, and sometimes for no small distances a well-defined channel is entirely lost, the waters wandering over the surface of the wash in small rivulets, seeping through the gravels, and coming together within banks and boundaries at some lower point. Usually, however, somewhere through the wash runs a well-defined channel.

The court construed the language of the deed above quoted as calling for the center line of the creek channel where the creek had a defined channel and for the center line of the

wash if a well-defined channel did not exist.   In this the trial court was unquestionably right, and under this construction evidence was adduced by the plaintiffs to show, first, that this creek had a well-defined channel through the wash, and, second, the location of this well-defined channel at the time called for in the deed.   Of course, their evidence in this behalf was met by counter and conflicting evidence upon the part of the defendants and appellants.   The creek channel as fixed by plaintiffs and respondents was much farther to the west, and, therefore, gave them more land, than the channel as the defendants and appellants would have the court declare it to have existed, for the channel of 1882 is not at all the present day channel.   The court's finding thus made cannot here be disturbed.

Another contention of appellants is that in 1882 Pacoima Creek had no well-defined channel through the wash, and therefore the center line of the wash should have been fixed by the court as the true line.   But we think the construction put upon the call was the true one, and as Pacoima Creek, so the court found, did have a channel through the wash, the center line of that channel fixed and controlled the question of the boundary.

Another contention of appellants is that a line substantially the center line of the wash had been accepted as the true boundary line by all the litigants either in person or by their predecessors in interest.   But touching this matter it is sufficient to refer to the testimony of but one witness, himself one of the plaintiffs, Mr. Widney.   This testimony is to the effect that Mr. Porter, one of the predecessors in interest of the defendants, employed an engineer to survey and delimit the boundary line, instructing him to fix the boundary line as the center line of the wash; that the surveyor so advised Mr. Widney, and said that he would give him a copy of the map when completed if he desired it.   Mr. Widney declined even to see the map, saying that surveys of that kind were worthless, did not interest him, and he did not care to be bothered with it.

This appeal is based wholly upon the contention of the insufficiency of the evidence to support the findings.   We have sufficiently indicated what the supporting evidence is and that it is ample to uphold the findings which the court made.

The judgment and order appealed from are therefore affirmed.

Melvin, J., and Victor E. Shaw, J., *pro tem.,* concurred.

Hearing in Bank denied.